UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
LEE PORRAZZO,

                            Plaintiff,

        - against -

BUMBLE BEE FOODS, LLC and THE STOP & SHOP
SUPERMARKET COMPANY, LLC,

                            Defendants.
------------------------------------------------------------------x

**OPINION AND ORDER**

10-CV-4367 (CS)

<u>Appearances</u>:

Christina Maria Killerlane
Law Offices of James J. Killerlane
White Plains, New York
*Counsel for Plaintiff*

Kenneth A. Schoen
Scott H. Goldstein
Bonner, Kiernan, Trebach & Criciata
New York, New York
*Counsel for Defendants*

<u>Seibel, J.</u>

        Before the Court is Defendants' Motion to Dismiss Plaintiff's Amended Complaint for

failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6), (Doc. 19), and

Defendants' unopposed Motion for Judicial Notice, (Doc. 22).  For the reasons stated below

Defendants' Motion for Judicial Notice is GRANTED and Defendants' Motion to Dismiss is

GRANTED in part and DENIED in part.

**I.      Background**

        The following facts are assumed to be true for purposes of the motion.

Plaintiff Lee Porrazzo consumed approximately ten six-ounce cans of tuna fish per week from approximately January 2006 to October 2008.  (Am. Compl. ¶ 1.)[1]  The tuna fish was canned by Defendant Bumble Bee Foods, LLC ("Bumble Bee").  (*Id.*)  Plaintiff purchased this tuna fish, which was frequently on sale, from Defendant Stop & Shop Supermarket Company ("Stop & Shop").  (*Id.*)  During this time Bumble Bee promoted its tuna fish as an "excellent and safe source of high quality protein, vitamins, minerals and Omega-3 fatty acids, as well as being low in saturated fats and carbohydrates[,] and touted its product as being 'heart healthy.'"  (*Id.* ¶ 3.)  The Bumble Bee tuna fish did not provide any warning that it contained mercury, "an odorless, colorless, tasteless, poisonous, heavy metal."  (*Id.* ¶ 4.)

At some point between January 2006 and October 2008, Plaintiff began to experience, two to three times per week, "episodes of chest pains, heart palpitations, sweatiness, dizziness, and lightheadedness," which led him to believe that he had a heart condition.  (*Id.* ¶ 5.)  Plaintiff sought medical attention and underwent numerous tests to understand the cause of his symptoms, but none of these tests provided an answer.  (*Id.* ¶ 5.)  On April 14, 2006, Plaintiff went to the White Plains Hospital Emergency Room because he believed (incorrectly) that he was having a heart attack.  (*Id.* ¶ 6.)

On or about October 1, 2008, Plaintiff's primary care practitioner ordered a heavy metals blood test, which showed that there was an elevated level of mercury in Plaintiff's blood.  (*Id.* ¶ 7.)  Specifically, Plaintiff's blood mercury level was 23 mcg/L as opposed to the less than 10 mcg/L, which is normal.  (*Id.*)  On the same date, the New York State Department of Health contacted Plaintiff by telephone, advised him that he had a dangerous level of mercury in his blood, asked him questions, filled out a questionnaire, and instructed him to stop eating tuna fish.  (*Id.* ¶ 8.)  Plaintiff stopped eating tuna fish, and a blood test on November 4, 2008, revealed that

---

[1]        "Am. Compl." refers to Plaintiff's Amended Complaint, filed on August 31, 2010.  (Doc. 9.)

his mercury levels had returned to normal.  (*Id.* ¶ 9.)  Plaintiff no longer suffered the heart attack-like symptoms previously described, but he alleges that he "remains worried today about what effects the mercury has had on his health."  (*Id.*)

Plaintiff filed the Amended Complaint on August 31, 2010, alleging claims for:  (1) breach of implied warranty of merchantability and fitness for consumption; (2) failure to warn under both strict liability and negligence theories; (3) "emotional distress;" (4) violations of New York State Agriculture and Markets Law; and (5) violations of New York State General Business Law.  (Doc. 9.)

## II.   <u>Legal Standards</u>

### A.   **Motion to Dismiss**

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Twombly*, 550 U.S. at 555 (alteration, citations, and internal quotation marks omitted).  While Federal Rule of Civil Procedure 8 "marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, . . . it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions."  *Iqbal*, 129 S. Ct. at 1950.

In considering whether a complaint states a claim upon which relief can be granted, the court may "begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth," and then determine whether the remaining well-pleaded factual allegations, accepted as true, "plausibly give rise to an entitlement to relief." *Id.* Deciding whether a complaint states a plausible claim for relief is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id.* (second alteration in original) (quoting Fed. R. Civ. P. 8(a)(2)).

### B.        Consideration of Documents Outside the Pleadings

When deciding a motion to dismiss, the Court is entitled to consider the following:

> (1) facts alleged in the complaint and documents attached to it or incorporated in it by reference, (2) documents "integral" to the complaint and relied upon in it, even if not attached or incorporated by reference, (3) documents or information contained in [a] defendant's motion papers if plaintiff has knowledge or possession of the material and relied on it in framing the complaint, (4) public disclosure documents required by law to be, and that have been, filed with the Securities and Exchange Commission, and (5) facts of which judicial notice may properly be taken under Rule 201 of the Federal Rules of Evidence.

*Weiss v. Inc. Vill. of Sag Harbor*, No. 10-CV-2603, 2011 WL 222480, at *4 (E.D.N.Y. Jan. 24, 2011) (internal quotation marks omitted); *accord Chambers v. Time Warner, Inc*., 282 F.3d 147, 152–53 (2d Cir. 2002).  A document is considered "integral" to the complaint where the plaintiff has "reli[ed] on the terms and effect of [the] document in drafting the complaint." *Chambers*, 282 F.3d at 153 (emphasis omitted).  Such reliance "is a necessary prerequisite to the court's consideration of the document on a dismissal motion; mere notice or possession is not enough." *Id*.; *see Faulkner v. Beer*, 463 F.3d 130, 134 (2d Cir. 2006) (integral documents may include documents partially quoted in complaint or on which plaintiff relied in drafting complaint).   If a

document outside of the complaint is to form the basis for dismissal, however, two requirements must be met in addition to the requirement that the document be "integral" to the complaint:  (1) "it must be clear on the record that no dispute exists regarding the authenticity or accuracy of the document," and (2) "[i]t must also be clear that there exist no material disputed issues of fact regarding the relevance of the document."  *Faulkner*, 463 F.3d at 134.

III.   <u>Discussion</u>

A.   **Documents the Court May Consider**

Before addressing the merits of Defendants' Motion to Dismiss, I must first address which documents may properly be considered on this motion.  Defendants' request that I take judicial notice of the following documents of the United States Food and Drug Administration ("FDA"):

- "What You Need to Know About Mercury in Fish and Shellfish," published by the United States Department of Health and Human Services and the United States Environmental Protection Agency, (Goldstein Cert. Ex. A)[2];

- "Backgrounder for the 2004 FDA/EPA Consumer Advisory:  What You Need to Know About Mercury in Fish and Shellfish," published by the United States Food and Drug Administration and the United States Environmental Protection Agency, (Goldstein Cert. Ex. B);

- Letter from Lester M. Crawford, D.V.M., Ph.D., United States Commissioner of Food and Drugs, to Bill Lockeyer, Attorney General of the State of California, dated August 12, 2005, re:  a suit filed on June 21, 2004 in San Francisco Superior Court, (Goldstein Cert. Ex. C);

- Section 540.600 of the Federal Food and Drug Administration's Compliance Policy Guide, which allows up to one part of methyl mercury per million non-mercury parts of the edible portion of seafood, (Goldstein Cert. Ex. D);

- FDA Letter Responding to Martek Petition, dated September 8, 2004, (Goldstein Cert. Ex. E).

---

[2]   "Goldstein Cert." refers to the October 20, 2010 Certification of Scott H. Goldstein in support of Defendants' motion requesting judicial notice.  (Doc. 22.)

"Rule 201 of the Federal Rules of Evidence permits judicial notice of a fact that is 'either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot be reasonably[] questioned.'" *U.S. v. Bryant*, 402 F. App'x 543, 545 (2d Cir. 2010).  Further, it is well-established that courts may take judicial notice of publicly available documents on a motion to dismiss.  *See Byrd v. City of N.Y.*, No. 04-CV-1396, 2005 WL 1349876, at *1 (2d Cir. June 8, 2005) ("[M]aterial that is a matter of public record may be considered in a motion to dismiss."); *Blue Tree Hotels Inv. (Can.) v. Starwood Hotels & Resorts Worldwide, Inc.*, 369 F.3d 212, 217 (2d Cir. 2004) (courts can "look to public records, including complaints filed in state court, in deciding a motion to dismiss"); *In re Yukos Oil Co. Secs. Litig.*, No. 04-CV-5243, 2006 WL 3026024, at *21 (S.D.N.Y. Oct. 25, 2006) ("Court may take judicial notices of [published] articles on a motion to dismiss without transforming it into a motion for summary judgment.") (citing *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 773 (2d Cir. 1991)).  "In the motion to dismiss context, . . . a court should generally take judicial notice 'to determine what statements [the documents] contain[ ] . . . not for the truth of the matters asserted.'"  *Schubert v. City of Rye*, No. 09-CV-6867, 2011 WL 1326039, at *3 (S.D.N.Y. Mar. 31, 2011) (alterations in original) (quoting *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991)).  Because the documents of which Defendants request I take judicial notice are all publicly available on the FDA website, this unopposed motion is granted and I take judicial notice of these documents for the fact that the statements were made, not for their truth.

### B.      Federal Preemption

Defendants contend that Plaintiff's state law claims must be dismissed because they are "preempted by a 'pervasive federal regulatory scheme implemented by and through the FDA'

which specifically addresses and regulates the extent to which the Defendants could distribute

canned tuna containing legally permitted levels of methylmercury and whether it was required to

warn consumers of trace amounts." (Defs.' Mem. 25–26.)[3]  In particular, Defendants assert that

"the FDA has already extensively regulated this arena by establishing the maximum

concentration of methylmercury for a can of tuna to be considered fit for consumption, issuing

advisories to target groups and implementing a comprehensive education campaign while

expressly rejecting the notion of and/or need for warning the general population of the presence

of methylmercury in tuna." (*Id.* at 29–30.)

The Supremacy Clause, U.S. Const., art. VI, cl. 2, "invalidates state laws that 'interfere

with, or are contrary to,' federal law." *Hillsborough Cnty., Fla. v. Automated Med. Labs., Inc.*,

471 U.S. 707, 712 (1985) (quoting *Gibbons v. Ogden*, 9 Wheat. 1, 211 (1824)).  "[S]tate laws

can be pre-empted by federal regulations as well as by federal statutes," *id.* at 713; *see Fidelity

Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153 (1982) (agency "regulations have no

less pre-emptive effect than federal statutes"), at least where the regulations "are properly

adopted in accordance with statutory authorization," *City of N. Y. v. FCC*, 486 U.S. 57, 63

(1988).  Preemption inquiries are "guided by the rule that [t]he purpose of Congress is the

ultimate touchstone in every pre-emption case." *Altria Grp., Inc. v. Good*, 555 U.S. 70, 76

(2008) (alteration in original and internal quotation marks omitted).  In addressing questions of

preemption, courts are to begin their analysis "with the assumption that the historic police

powers of the States [are] not to be superseded by the Federal Act unless that was the clear and

manifest purpose of Congress." *Id.* at 77 (alteration in original).  This assumption "applies with

particular force when Congress has legislated in a field traditionally occupied by the States." *Id.*

---

[3]        "Defs.' Mem." refers to Defendants Bumble Bee Foods, LLC and the Stop & Shop Supermarket Company, LLC's Memorandum of Law in Support of Their Motion to Dismiss Plaintiff's Amended Complaint for Failure To State a Claim.  (Doc. 19.)

In *Fellner v. Tri-Union Seafoods, L.L.C.*, the Third Circuit addressed a case almost identical to this one and found that the plaintiff's state law claims were not preempted.  539 F.3d 237 (3d Cir. 2008).  Specifically, in *Fellner* the plaintiff alleged that her diet consisted almost exclusively of the defendant's canned tuna products for a period of five years, that those tuna products contained methylmercury, and that due to defendant's failure to warn of the dangers of methylmercury, plaintiff contracted mercury poisoning and suffered physical and emotional injuries.  As in the case at bar, the *Fellner* defendant argued that Plaintiff's state law claims were preempted by federal law.   The Third Circuit disagreed:

> This is a situation in which the FDA has promulgated no regulation concerning the risk posed by mercury in fish or warnings for that risk, has adopted no rule precluding states from imposing a duty to warn, and has taken no action establishing mercury warnings as misbranding under federal law or as contrary to federal law in any other respect.  Fellner's lawsuit does not conflict with the FDA's "regulatory scheme" for the risks posed by mercury in fish or the warnings appropriate for that risk because the FDA simply has not regulated the matter.  Fellner's duty-to-warn claim does not conflict with an FDA determination deliberately to forego warnings because the FDA took no action to preclude state warnings—at least, no binding action via ordinary regulatory procedures . . . .  Finally, Fellner's lawsuit does not conflict with the FDCA's food misbranding provision or the FDA's actions thereunder because the FDA has not exercised its misbranding authority under the FDCA with respect to methylmercury warnings for fish.

*Fellner*, 539 F.3d at 256.

As far as this Court is aware, since the time of the *Fellner* decision the FDA has promulgated no new regulations with respect to methylmercury in tuna.  Moreover, the *Fellner* court had before it the same supporting documents that were submitted to me on this motion— namely, the five documents of which I have been asked to take judicial notice.[4]

---

[4]     The district court in *Fellner* took judicial notice of all these documents except for the FDA's Letter Responding to the Martek Petition, (Goldstein Cert. Ex. E).  *See Fellner*, 539 F.3d at 242–43.  Although the lower court did not take formal judicial notice of that last document, the circuit court nonetheless specifically addressed it and opined that it failed to see how it "might preempt Fellner's lawsuit" or how it spoke "to a relevant issue," because it "concerned not the risks of mercury in fish specifically but rather the impact of dietary supplements of

Although I am not bound by the *Fellner* Court's decision, I find its reasoning and approach to this issue persuasive.  Thus, for substantially the same reasons cited by the *Fellner* court, I decline to find that Plaintiff's state law claims here are preempted by a pervasive federal regulatory scheme implemented by and through the FDA.[5]

### C.      Proximate Cause

Defendants next assert that all of Plaintiff's claims must be dismissed because Plaintiff fails to allege that he sustained any injuries that were proximately caused by his consumption of Defendants' canned tuna fish.  (Defs.' Mem. at 14.)   Specifically, Defendants assert that despite Plaintiff's consultations "with numerous physicians . . . there was no diagnosis of any specific ailment," and although Plaintiff claims that he remains worried about what effects the mercury has had on his health, "he has not alleged the existence of any actual ill health effects caused by consumption of tuna."  (*Id.*)  Defendants also assert that Plaintiff has not alleged "that the

---

'omega-3 fatty acids' on heart disease," and the "FDA merely explained that it would decline to require that the omega-3 fatty acid health claim be accompanied by a mercury warning, not that all mercury warnings should be affirmatively prohibited."  *Fellner*, 539 F.3d at 253 n.10.

[5]        Defendants contend that Plaintiff's Opposition, which relies heavily on the *Fellner* decision, is "devoid of any mention of the live circuit split on this issue."  (Defendants Bumble Bee Foods, LLC and the Stop & Shop Supermarket Company, LLC's Reply Brief in Further Support of Defendants' Motion to Dismiss ("Defs.' Reply"), Doc. 21.)  Defendants' base their assertion that there is a "live circuit split" on their claim that "the California Supreme Court affirmed a thirty-eight page decision which concluded that:  (1) California warning laws were preempted by a conflict with the FDCA; and (2) methylmercury in tuna is naturally occurring.  *People ex rel. Brown at* 171 Cal. App. 4th 1549 (1st Dist. 2009)."  (*Id.*)  This assertion is disingenuous.  To begin, the California Supreme Court did not express any opinion with respect to the Court of Appeal's affirmation of the trial court's ruling in that case.  Instead, the California Supreme Court merely denied a request for depublication of the Appellate Court's opinion, *People v. Tri-Union Seafoods*, No. A116792, 2009 Cal. LEXIS 6018 (June 24, 2009), an action which "is not an expression of the court's opinion of the correctness of the result of the decision or of any law stated in the opinion."  Cal. R. Ct. 8.1125(d).  Moreover, the California Appellate Court, which did express an opinion regarding the trial court's decision, was explicit that it affirmed the lower court's judgment "*solely* on the ground that substantial evidence supports the trial court's finding that methylmercury in tuna is naturally occurring."  *People ex rel. Brown*, 171 Cal. App. 4th at 1576 (1st Dist. 2009).  The assertion that either the California Supreme or Appellate Court made any determination with respect to preemption is simply wrong.  Furthermore, even if either court had reached the preemption issue and determined that state law was preempted in the circumstances present here, this would not create a "circuit split," which occurs when two or more *federal* courts of appeal differ in their interpretations.  In any event, as noted above, I agree with the *Fellner* court's analysis of the preemption issue here.

elevated mercury level in his blood was proximately caused by his consumption of Bumble Bee canned tuna fish."  (Defs.' Reply at 8.)[6]

"Under New York law, [i]t is well settled that, whether [an] action is pleaded in strict products liability, breach of warranty or negligence, it is a consumer's burden to show that a defect in the product was a substantial factor in causing the injury."  *Viscusi v. P & G-Clairol, Inc.*, 346 F. App'x 715, 716 (2d Cir. 2009) (alterations in original and internal quotation marks omitted); *see Colon ex rel. Molina v. BIC USA, Inc.*, 199 F. Supp. 2d 53, 82 (S.D.N.Y. 2001) ("To make out a prima facie case for negligence in New York, a plaintiff must show (1) that the manufacturer owed plaintiff a duty to exercise reasonable care; (2) a breach of that duty by failure to use reasonable care so that a product is rendered defective, i.e. reasonably certain to be dangerous; (3) that the defect was the proximate cause of the plaintiff's injury; and (4) loss or damage. . . .  Strict liability in New York requires a showing that (1) a defective product (2) caused plaintiff's injury."); *Fahey v. A.O. Smith Corp.*, 908 N.Y.S.2d 719, 723 (2d Dep't 2010) ("Whether an action is pleaded in strict products liability, breach of warranty, or negligence, the plaintiffs must prove that the alleged defect is a substantial cause of the events which produced the injury.").

Defendants' contention that Plaintiff has not alleged that he suffered injury is unavailing. While Plaintiff has not conclusively proven that he sustained long-term physical injuries from his ingestion of mercury, he has pleaded that he suffered from an extremely elevated blood mercury level, and a series of heart attack-like symptoms including episodes of chest pains, heart palpitations, sweatiness, and dizziness and lightheadedness, all of which constitute injury.  (Am. Compl. ¶¶ 5, 6, 23, 25, 39, 41, 44.).  *See Vamos v. Coca-Cola Bottling Co.*, 627 N.Y.S.2d 265,

---

[6]        "Defs.' Reply" refers to Defendants Reply Brief in Further Support of Defendants' Motion to Dismiss, filed on January 14, 2011.  (Doc. 21.)

270–71, 396 (N.Y. Civ. Ct. 1995) (plaintiff who "had a rapid heartbeat, an upset stomach, was nauseous and sweating . . . and vomited, and . . . had diarrhea" suffered injury for purposes of products liability; "extent and permanency" of plaintiff's injury "relate to the issue of damages," not liability); *Mitchell v. Coca Cola Bottling Co.*, 200 N.Y.S.2d 478, 479–80 (3d Dep't 1960) (nausea and vomiting resulting from drinking soda containing foreign substance is recoverable injury). Thus, at this stage, Plaintiff's factual allegations are sufficient for me to find it plausible that Plaintiff suffered an injury.

I also find that Plaintiff has plausibly alleged that Defendants' conduct was the proximate cause of his injuries. "Proximate cause requires only some direct relation between the injury asserted and the injurious conduct alleged, and excludes only those link[s] that are too remote, purely contingent, or indirect." *Staub v. Proctor Hosp.*, 131 S. Ct. 1186, 1192 (2011) (internal quotation marks omitted). Moreover, "[t]he issue of proximate cause may be determined as a matter of law [only] where no reasonable person could find causation based on the facts alleged in the complaint." *Pelman v. McDonald's Corp.*, 237 F. Supp. 2d 512, 538 (S.D.N.Y. 2003) (finding "[n]o reasonable person could find probable cause based on the facts in the Complaint without resorting to 'wild speculation'"). Plaintiff asserts that Bumble Bee canned tuna fish was his major source of protein from approximately January 2006 to October 2008, (Am. Compl. ¶ 3), that it contained mercury, (*id.* ¶ 4), that during that time period he began to experience physical symptoms that led him to believe he had a heart condition, (*id.* ¶¶ 5–6), that an October 2008 heavy metals blood test revealed that Plaintiff had a very elevated blood mercury level, (*id.* ¶ 8), that Plaintiff was informed of these test results and instructed to stop eating tuna fish, which he did, and that his mercury levels returned to normal and his symptoms abated, within a month thereafter, (*id.* ¶¶ 8–9). Based on the foregoing, Plaintiff asserts that he was "caused to sustain

serious personal injuries" as a result of the defendants' tuna fish products which contained

"poisonously high levels of mercury." (*Id.* ¶ 39.)  This timeline provides more than sufficient

factual allegations to make it plausible that Plaintiff's ingestion of Defendants' tuna fish was the

cause of his injuries.[7]  Viewing the facts in the Amended Complaint in the light most favorable

to the Plaintiff, as I must on a motion to dismiss, I find that Plaintiff has sufficiently alleged a

direct causal relationship between his consumption of Defendants' tuna fish and his injuries.

Defendants' Motion to Dismiss on this basis is therefore denied.

### D.    Emotional Distress Claim

Defendants next assert that Plaintiff's claims for emotional distress must be dismissed

because Plaintiff fails to allege a physical injury which was proximately caused by his

consumption of Defendants' canned tuna fish.  As described above, I find he has sufficiently

pleaded the same.  But emotional distress is a prayer for relief, not a separate cause of action, *see*

*Brennan v. N.Y. Law Sch.*, No. 10-CV-0338, 2011 WL 2899154, at *1 (S.D.N.Y. Jul. 11, 2011)

(granting Plaintiff's "motion to amend to add a request for emotional distress damages to the

prayer for relief"); *Galotti v. Town and City of Stamford*, No. 96-CV-0224, 1996 WL 684409, at

*5 (D. Conn. Nov. 19, 1996) ("Damages for emotional distress may be recovered . . . .  However,

they should be included as part of the 'prayer for relief' section of the complaint.  They are not to

be pled as a separate count."), and Plaintiff's claims for emotional distress are therefore

dismissed.  That Plaintiff's claims for emotional distress are dismissed does not, however,

---

[7]      Defendants argue that Plaintiff concedes that the cause of his symptoms could not be determined.  (*See* Defs.' Mem. 13 ("[D]espite consulting with numerous doctors, no one was able to causally relate any of the plaintiff's health problems with his alleged elevated mercury levels and alleged tuna consumption."); Defs.' Reply 8 ("[D]espite a multitude of exams and testing by several medical providers plaintiff was not found to have any physical ailment.").)  In so doing Defendants disingenuously interpret statements in paragraphs six and seven of the Amended Complaint that clearly refer to the period *before* Plaintiff's blood was tested for mercury.  That Plaintiff's mercury levels were dangerously high until he stopped eating Defendants' tuna fish, whereupon they returned to normal and his symptoms disappeared, more than plausibly supports the conclusion that the tuna caused the elevated mercury and the elevated mercury caused his symptoms.  No more is required at the motion to dismiss stage.  That the cause of the symptoms was not initially apparent does nothing to undermine the plausibility of the allegations.

preclude Plaintiff's ability to recover emotional distress damages if he is successful on his

remaining claims.  *See Goldberg v. N.Y. Times*, 411 N.Y.S.2d 294, 295 (1st Dep't 1978) ("The

relief sought, though erroneously stated as a separate cause, should be deemed part of the prayer

for damages.").

### E.    Plaintiff's Product Liability Claims

Defendants also contend that Plaintiff's common law claims—Counts I through IV, for

breach of the implied warranties of merchantability and fitness for consumption[8] and failure to

warn—must be dismissed because, among other things:  (1) consumers reasonably expect canned

tuna fish to contain mercury, which naturally occurs in fish and which Defendants cannot,

through ordinary care, remove; and (2) Plaintiff overconsumed the product.

### 1.    Legal Standards

Under New York law, "[a] manufacturer who places a defective product on the market

that causes injury may be liable for the ensuing injuries."  *Liriano v. Hobart Corp.*, 92 N.Y.2d

232, 237 (1998).   In an action for strict products liability,

> a manufacturer, wholesaler, distributor, or retailer who sells a product in a
> defective condition is liable for injury which results from the use of the product
> regardless of privity, foreseeability or the exercise of due care.  The plaintiff need
> only prove that the product was defective as a result of either a manufacturing
> flaw, improper design, or a failure to provide adequate warnings regarding the use
> of the product and that the defect was a substantial factor in bringing about the
> injury.

*Leary ex rel. Debold v. Syracuse Model Neighborhood Corp.*, 799 N.Y.S.2d 867, 872–73 (Sup.

Ct. 2005) (internal citations and quotation marks omitted); *see Liriano*, 92 N.Y.2d at 237 ("A

product may be defective when it . . . is not accompanied by adequate warnings . . . .").

---

[8]        Plaintiff also recites formulaic elements for breach of express warranty, (*see* Am. Compl. ¶¶ 19, 22, 35,
38), but provides no facts with respect to any express warranty.  Accordingly, the Amended Complaint is dismissed
to the extent it alleges a breach of express warranty.

A manufacturer may also be held liable under New York law for breach of implied warranty of merchantability when its products are not "fit for the ordinary purposes for which such goods are used."  New York U.C.C. § 2-314(2)(c).  Specifically, a Plaintiff may recover "upon a showing that [a] product was not minimally safe for its expected purpose," and the focus of a breach of implied warranty inquiry is whether the product meets "the expectations for the performance of the product when used in the customary, usual and reasonably foreseeable manners."  *Denny v. Ford Motor Co.*, 87 N.Y.2d 248, 258–59 (1995).

### 2.    Reasonability of Tuna Consumption

Defendants contend that Plaintiff's consumption of its canned tuna fish was unreasonable as a matter of law and that Plaintiff's claims therefore cannot survive.  (*See* Defs.' Mem. at 22 ("[A] diet consisting of nearly 1,500 cans or over 500 lbs of tuna in thirty-three months is undisputedly outside the 'intended use' of the product").)  Defendants' contention is unavailing.  Plaintiff's daily consumption of one to two cans of tuna fish cannot, as a matter of law at this stage, be said to be unreasonable.[9]  Indeed, Plaintiff was arguably exactly the type of consumer that Defendants desired—a consumer who purchased and consumed their product regularly.  Moreover, even if Plaintiff's consumption of such quantities of tuna was unreasonable, Defendants still would be liable for failure to warn if Plaintiff's conduct was foreseeable.  *See*

---

[9]      Defendants attempt to analogize this case to *Pelman*, which held that fast food restaurants have no duty to warn customers that certain foods, like hamburgers and french fries, if consumed over a prolonged period of time, may lead to obesity.  237 F. Supp. 2d at 531–34, 540–43.  That case is not, however, instructive here.  The *Pelman* court stated unequivocally that "[i]t is well-known that fast food in general, and McDonalds' products in particular, contain high levels of cholesterol, fat, salt, and sugar, and that such attributes are bad for one."  *Id.* at 532.  By contrast, there is no indication in the record here, at least at this stage, that it is common knowledge that canned tuna fish contains high levels of methylmercury and that ingestion of such fish in large quantities can have deleterious health effects.  Thus, unlike the *Pelman* Plaintiffs, Plaintiff here was allegedly endeavoring to eat a heart-healthy diet, but because he was unaware that canned tuna fish contained high levels of methylmercury, he inadvertently exposed himself to an unhealthy and potentially dangerous substance.

I likewise do not find determinative Comment (h) to Section 402A of the Restatement (2d) of Torts, which asserts that if an "injury results . . . from abnormal consumption, as where a child eats too much candy and is made ill, the seller is not liable."  I simply cannot determine as a matter of law, at least at this stage, that eating one to two cans of tuna fish daily in an apparent effort to pursue a heart-healthy diet is unreasonable or unforeseeable, and akin to child who eats too much candy and thereby makes herself ill.

14

*Liriano*, 92 N.Y.2d at 240 (manufacturer of defectively designed product liable for failure to warn of dangers resulting from both intended use of product and foreseeable misuses).  It is plausibly foreseeable that an individual who is trying to pursue a heart healthy diet could consume one to two cans of canned tuna fish daily, particularly when it was advertised as "low in fat, high in protein and thus, 'heart healthy.'"  (Pl.'s Mem.14.)[10]  In any event, the question of whether Plaintiff's daily consumption of tuna fish was indeed unreasonable or unforeseeable is properly left for a jury to determine.  *See Lugo v. LJN Toys, Ltd.*, 75 N.Y.2d 850, 852 (1990) (question of "whether the product was defective and reasonably safe for its intended use or a reasonably foreseeable unintended use" is for jury); *Heller v. Encore of Hicksville*, 53 N.Y.2d 716, 718 (1981) ("It was within the province of the jury to determine" whether defendant failed to warn plaintiff of a "foreseeable" risk); *Johnson v. Johnson Chem. Co.*, 588 N.Y.S.2d 607, 610 (2d Dep't 1992) ("Whether a particular way of misusing a product is reasonably foreseeable, and whether the warnings which accompany a product are adequate to deter such potential misuse, are ordinarily questions for the jury.").  Defendants' motion to dismiss on this basis is therefore denied.

### 3.    Reasonable Expectations and Obviousness of Danger

In order to succeed on either a failure to warn claim, or a breach of implied warranty claim, a plaintiff must also establish that the danger inherent in the injurious product was not open and obvious and thus something which a reasonable consumer would ordinarily anticipate finding therein.  *See Fitzgerald v. Fed. Signal Corp.*, 883 N.Y.S.2d 67, 69 (2d Dep't 2009) (dismissing plaintiff's strict products liability claim based on defendant's alleged duty and failure to warn of risk of hearing loss from prolonged exposure to sirens because "risk alleged is 'open

---

[10]    "Pl.'s Mem." refers to Plaintiff's memorandum of law in opposition to Defendants' motion to dismiss, filed on January 15, 2011.  (Doc. 20.)

15

and obvious' and 'readily apparent as a matter of common sense'"); *Lamb v. Kysor Indus.*, 759

N.Y.S.2d 266, 268 (4th Dep't 2003) (no duty to warn of open and obvious danger of placing

fingers in path of power saw); *Belling v. Haugh's Pools, Ltd.*, 511 N.Y.S.2d 732, 733 (4th Dep't

1987) (no duty to warn of open and obvious danger of diving into shallow pool); *Langiulli v.*

*Bumble Bee Seafood, Inc.*, 604 N.Y.S.2d 1020, 1021 (Sup. Ct. 1993) (breach of warranty claim

stated when "consumer is injured by conditions which he could not have reasonably anticipated

to be present in the product purchased").  Whether a danger is in fact common knowledge among

the public is ordinarily a question of fact that cannot be resolved at the motion to dismiss stage.

*See In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, 175 F. Supp. 2d 593, 626

n.50 (S.D.N.Y. 2001) (denying defendant's motion to dismiss plaintiffs' failure to warn claims

because court could not determine, as matter of law, that "it is common knowledge that gasoline

must be handled with care"); *Rudloff v. Wendy's Rest.* 821 N.Y.S.2d 358, 369 (City Ct. Buffalo

2006) (relevant question on breach of implied warranty claim is whether one would reasonably

anticipate substance would be present, and this question is ordinarily one of fact for jury).  *But*

*see Kaplan v. Am. Multi-Cinema, Inc.*, 873 N.Y.S.2d 234, *2 (Civ. Ct. 2008) (table decision)

(determining as matter of law that one reasonably expects un-popped kernels in popcorn);

*Vitiello v. Captain Bill's Rest.*, 594 N.Y.S.2d 295, 296 (2d Dep't 1993) (determining, as matter

of law, that one reasonably expects fish filet is not free of all bones).

        This is not a case where I can say as a matter of law at this stage that the dangers of

mercury poisoning from consumption of canned tuna fish are open and obvious, and that an

ordinary consumer would necessarily be aware that canned tuna fish contains high levels of

methylmercury, the consumption of which could lead to mercury poisoning.  This is particularly

so because mercury is "an odorless, colorless, tasteless," metal, and thus nothing about the

appearance of the fish itself would reveal either that it contains mercury or that such mercury may be dangerous if consumed on a daily basis.  (Am. Compl. ¶ 3.)  There may be many consumers who are unaware that canned tuna fish—which they believe is a low-fat, heart-healthy, source of protein—in fact contains mercury which can, in high quantities, be harmful to their health.  Thus, although the facts as developed may permit the conclusion, by the Court on summary judgment or by the jury at trial, that consumers do reasonably expect mercury in their tuna and understand that it can be harmful, the allegations of the Amended Complaint do not support such a conclusion, and it is not obvious to the Court as a matter of "judicial experience and common sense."  *Iqbal*, 129 S. Ct. at 1950.

### 4.    Failure to Warn

Plaintiff here has adequately set forth a strict liability failure to warn claim.  As noted above, he has established both injury and proximate cause, and has sufficiently alleged that the dangers of mercury poisoning from consumption of canned tuna fish are not open and obvious.  Further, there is no suggestion at this stage that this particular Plaintiff was, in fact, aware either that canned tuna fish contained methylmercury or that there were risks inherent in the consumption of fish which contained high concentrations of this substance.  *See Colon ex rel. Molina*, 199 F. Supp. 2d at 85 ("A failure-to-warn inquiry focuses on three factors:  obviousness of risk from actual use of product, knowledge of the particular user, and proximate cause.").  Finally, the fact that methylmercury in tuna may be "naturally occurring" does not necessarily mean Defendants cannot be strictly liable for failing to warn customers of same.

Defendants nonetheless contend that Stop & Shop cannot be held liable for failure to warn because "there are no circumstances under which the alleged defect could have been discovered during a normal inspection while the tuna cans were in Defendant Stop & Shop's

possession." (Defs.' Mem. 23.) "There is no question," however, "that under New York law the

seller of a defective product may be strictly liable for any resultant injury even though the seller

was not responsible for the defect." *Davila v. Goya Foods, Inc.*, No. 05-CV-8607, 2007 WL

415147, at *6 (S.D.N.Y. Feb. 7, 2007). Thus, an injured plaintiff in a strict liability failure to

warn case may recover from both manufacturers and retail sellers of the product. *See Adeyinka*

*v. Yankee Fiber Control, Inc.*, 564 F. Supp. 2d 265, 274–75 (S.D.N.Y. 2008) (strict liability for

product defects "also extends to sellers who by reason of their continuing relationships with

manufacturers, are most often in a position to exert pressure for the improved safety of products

and can recover increased costs within their commercial dealings, or through contribution or

indemnification in litigation") (internal quotation marks omitted). The retailer can be held

strictly liable for failure to warn regardless of whether it could discover the defect upon normal

visual inspection of the product. *See Leary ex rel. Debold*, 799 N.Y.S.2d at 873 ("Distributors

and retailers may be held strictly liable to injured parties, even though they may be innocent

conduits in the sale of the product . . . . It is well settled that strict products liability extends to

retailers and distributors in the chain of distribution even if they never inspected, controlled,

installed or serviced the product") (internal quotation marks omitted).[11] Defendants' motion to

---

[11]     Defendants argue that under New York law "a retailer is liable for the sale or failure to warn of a defective
product, 'only if it fails to detect a dangerous condition that it could have discovered during the course of a normal
inspection while the product was in its possession,'" (Defs. Reply 13), citing *Pelman*, 237 F. Supp. 2d at 523,
*Luckern v. Lyonsdale Energy Ltd. P'ship*, 722 N.Y.S.2d 632, 636 (4th Dep't 2001), and *Sideris v. Simon A. Rented
Servs.*, 678 N.Y.S.2d 771, 772 (2d Dep't 1998). These cases do not, however, relieve Stop & Shop of liability
because they do not address *strict liability* claims. In both *Pelman* and *Luckern* the courts dealt exclusively with
claims that arose under negligence and breach of warranty, not strict liability, and thus they are not analogous here.
In *Sideris*, plaintiff was injured when she slipped and fell on a floor mat at the restaurant where she was employed.
678 N.Y.S.2d at 772. She brought claims against the company that rented the mat to the restaurant, under
"negligence and, purportedly, breach of implied warranty and strict products liability" theories. *Id.* The *Sideris*
court, in a two-page opinion, reversed the lower court's denial of summary judgment because "plaintiff failed to
proffer sufficient proof to demonstrate the existence of a material issue of fact." *Id*. The court further asserted that
the lower court's judgment was also improper because defendant "demonstrated that it had satisfied its duty to
inspect by inspecting all mats both before and upon delivery." *Id.* (internal citation omitted). It is not clear from
this short opinion whether the court believed that defendant's duty to inspect applied to each of plaintiff's causes of
actions, or whether it was applicable only to plaintiff's claims for negligence and/or breach of implied warranty. If

dismiss Plaintiff's strict liability failure to warn claim (Counts I and II) against both Bumble Bee and Stop & Shop is therefore denied.

Plaintiff has also adequately alleged a negligent failure to warn claim against Bumble Bee, because "[r]egardless of the descriptive terminology used to denominate the cause of action (viz, 'strict liability' or 'negligence'), where the theory of liability is failure to warn, negligence and strict liability are equivalent." *Wolfgruber v. Upjohn Co.*, 423 N.Y.S.2d 95, 97 (4th Dep't 1979); *see Anderson v. Hedstrom Corp.*, 76 F. Supp. 2d 422, 439 (S.D.N.Y. 1999) ("Where liability is predicated on a failure to warn, New York views negligence and strict liability claims as equivalent.") (internal quotation marks omitted); *Denny*, 87 N.Y.2d at 258 ("Failure to warn claim . . . couched in terms of strict liability, is indistinguishable from a negligence claim.") (internal quotation marks omitted). Defendants' motion to dismiss Plaintiff's claim against Bumble Bee for negligent failure to warn is thus likewise denied.

Defendants are correct, however, that Plaintiff's negligent failure to warn claim cannot be sustained against Stop & Shop. Under a negligence theory of liability, a "retailer . . . can be held liable . . . for the sale of a defective product or for failure to warn only if it fails to detect a dangerous condition that it could have discovered during the course of a normal inspection while the product was in its possession." *Pelman*, 237 F. Supp. 2d at 523. Consequently, Defendants' motion to dismiss Plaintiff's claim (within Count II) for negligent failure to warn against Stop & Shop is granted.

### 5.   Breach of Implied Warranty of Merchantability

Plaintiff has also adequately asserted a breach of implied warranty of merchantability claim here. "To establish that a product is defective for purposes of a breach of implied warranty

---

the *Sideris* court in fact intended to assert that defendant could avoid being held liable under a theory of strict liability if it fulfilled its duty to inspect, this view appears to contradict the vast majority of New York cases that address this issue.

of merchantability claim, a plaintiff must show that the product was not reasonably fit for its

intended purpose, an inquiry that focuses on the expectations for the performance of the product

when used in the customary, usual[,] and reasonably foreseeable manners." *O'Sullivan v. Duane*

*Reade, Inc.*, 910 N.Y.S.2d 763, *6 (N.Y. Sup. 2010) (table decision) (internal quotation marks

omitted); *see* New York U.C.C. § 2-314(2)(c); *Derienzo v. Trek Bicycle Corp.*, 376 F. Supp. 2d

537, 570 (S.D.N.Y. 2005); *Denny*, 639 N.Y.S.2d at 256; *Wojcik v. Empire Forklift, Inc.*, 783

N.Y.S.2d 698, 701 (3d Dep't 2004).[12]  Further, "[i]n a breach of implied warranty action, the

inquiry is not whether there were safer designs available." *Groome v. Matsushita Elec. Corp. of*

*Am.*, No. 92-CV-3073, 2000 WL 341134, at *6 (E.D.N.Y. Mar. 30, 2000); *see Bah v. Nordson*

*Corp.*, No. 00-CV-9060, 2005 WL 1813023, at *13 (S.D.N.Y. Aug. 1, 2005) ("[W]hether or not

there were feasible safer alternative designs . . . is irrelevant to the merits of Plaintiff's breach of

implied warranty claim."); *Gonzalez by Gonzalez v. Morflo Indus., Inc.*, 931 F. Supp. 159, 165

(E.D.N.Y. 1996) ("Plaintiff's recovery in a breach of warranty action depends on a showing that

the product was not minimally safe for its expected purpose, regardless of the feasibility of

---

[12]　　*Plemmons v. Steelcase Inc.* held that under New York law, in addition to the reasonable expectation test
cited above, "[a] breach of implied warranty claim requires proof of the following three elements:  (1) that the
product was defectively designed or manufactured; (2) that the defect existed when the manufacturer delivered it to
the purchaser or user; and (3) that the defect is the proximate cause of the accident." No. 04-CV-4023, 2007 WL
950137, at *3 (S.D.N.Y. Mar. 29, 2007) (internal quotation marks omitted). *Plemmons* cited to three cases all of
which were applying maritime law. *See Silvanch v. Celebrity Cruises, Inc.*, 171 F. Supp. 2d 241, 259 (S.D.N.Y.
2001); *In re American Export Lines, Inc.*, 620 F. Supp. 490, 518 (S.D.N.Y. 1985); *Cigna Prop. & Casual Ins. Co. v.
Bayliner Marine Corp.*, No. 92-7891, 1995 WL 125386, at *12 (S.D.N.Y. Mar. 22, 1995).
　　　　Since *Plemmons*, some courts addressing breach of implied warranty claims under New York law have
picked up the *Plemmons* language and asserted that the aforementioned three elements are required for establishing
a breach of implied warranty, *see, e.g.*, *Oscar v. BMW of N. Am., LLC*, 274 F.R.D. 498 (S.D.N.Y. 2011); *Pinello v.
Andreas Stihl Ag & Co. KG*, No. 08-CV-0452, 2011 WL 1302223 (N.D.N.Y. Mar. 31, 2011); *Dayton Superior
Corp. v. Spa Steel Prods., Inc.*, No. 08-CV-1312, 2010 WL 3825619 (N.D.N.Y. Sept. 24, 2010); *Lewis v. White*, No.
08-CV-7480, 2010 WL 6465230 (N.D.N.Y. Jul. 1, 2010); *Lewis v. Abbott Labs.*, No. 08-CV-7480, 2009 WL
2231701 (S.D.N.Y. Jul. 24, 2009); *Barrett v. Black & Decker*, No. 06-CV-1970, 2008 WL 5170200 (S.D.N.Y. Dec.
9, 2008); *Dalton v. Stedman Mach. Co.*, No. 05-CV-0452, 2008 WL 351676 (N.D.N.Y. Feb. 7, 2008), while others
have simply looked to the reasonable expectations test to identify such a breach, *see, e.g.*, *Scientific Components
Corp. v. Sirenza Microdevices, Inc.*, 399 F. App'x 637 (2d Cir. 2010); *O'Sullivan*, 910 N.Y.S.2d 763; *Ferraro v.
Perry's Brick Co.*, 924 N.Y.S.2d 308 (Civ. Ct. 2011) (table decision).

making the product safer."); *Rudloff*, 821 N.Y.S.2d at 368 (neither origin of object nor efforts to prevent object's presence are determinative factors in reasonable expectations test).

The relevant question here, therefore, is whether the presence of mercury in Defendants' canned tuna, without any accompanying warnings, renders it not reasonably fit for the ordinary purpose for which it was intended.  In other words, Plaintiff's claim for breach of implied warranty turns upon whether:  1) the customary, usual, and reasonably foreseeable use of tuna fish includes the type of consumption Plaintiff engaged in—namely, eating approximately one to two cans of tuna fish daily for more than two years; and 2) Plaintiff reasonably expected mercury—which, when consumed in those quantities, could be poisonous—to be present in the fish.  As explained above, at this stage Plaintiff has plausibly alleged as much.  (The Court on summary judgment or a jury could, of course, conclude otherwise.)  Furthermore, Plaintiff's ability to recover under his breach of implied warranty claim is not affected by the feasibility of making the product safer, and thus whether mercury is naturally present in tuna and/or can be removed through the use of ordinary care is irrelevant.  Because Plaintiff plausibly alleges that he was, indeed, "injured by conditions which he could not have reasonably anticipated to be present in the product purchased," *Langiulli*, 604 N.Y.S.2d at 1021, Defendants' motion to dismiss Plaintiff's claim for breach of the implied warranty of merchantability as to Bumble Bee is denied.

With respect to Plaintiff's claim for breach of implied warranty of merchantability against Stop & Shop (Count II), however, such claim must fail.  For claims for breach of warranty and negligence, a retailer "cannot be held liable for injuries sustained from the contents of a sealed product even though a test might have disclosed a potential danger" because "[t]here [i]s no obligation upon it to make such a test."  *Brownstone v. Times Square Stage Lighting Co.*,

333 N.Y.S.2d 781, 782 (1st Dep't 1972); *see Cosgrove v. Delves' Estate*, 315 N.Y.S.2d 369, 371 (2d Dep't 1970) (dismissing claim for breach of warranty against retailer because "evidence established that she could not have discovered any danger by mere inspection [and s]he was not obligated under these circumstances to . . . test" the product); *Alfieri v. Cabot Corp.*, 235 N.Y.S.2d 753, 757 (1st Dep't 1962) (retail seller not liable "even though it might have discovered the dangerous character . . . by a test [because t]here was no obligation upon it to make such test").  Because Stop & Shop is a retail seller that cannot be held liable under breach of warranty for a defect it could not discover through ordinary inspection, Defendants' motion to dismiss Count II, as to a breach of implied warranty, is granted.

### F.      Counts III and IV

Defendants also contend that Counts III and IV should be dismissed because "Plaintiff improperly couches a common law claim for punitive damages, which is a prayer for relief, as a cause of action . . . [and] there is no independent cause of action for punitive damages" under New York law.  (Defs.' Mem. 22.)  Counts III and IV appear to merely duplicate the claims that are set forth in Counts I and II.  Thus, to the extent that Counts III and IV are, in fact, simply requests for punitive damages, they are dismissed as "separate claim[s] for punitive damages . . . [which] cannot be maintained" because "[i]t is settled that there is no independent cause of action for punitive damages."  *Mayes v. UVI Holdings*, 723 N.Y.S.2d 151, 157 (1st Dep't 2001) (internal quotation marks omitted).  That Counts III and IV are dismissed does not, however, preclude Plaintiff's ability to recover punitive damages if he is successful on his remaining claims.  *See Goldberg*, 411 N.Y.S.2d at 294 ("The relief sought, though erroneously stated as a separate cause, should be deemed part of the prayer for damages.").

G.      NYS Agriculture & Markets Law Claims

Finally, Defendants assert that Counts V and VI should be dismissed because Defendants' manufacture and sale of its canned tuna fish does not violate any provision of the New York Agriculture and Markets ("A & M") Law.  (Defs.' Mem. 24.)  Plaintiff, however, contends that Defendants' product was 'adulterated' and 'misbranded' in violation of Sections 199, 200, and 201 of this Statute.  (Pl.'s Mem. 23.)

Section 199-a(1) of the A & M Law provides that "No person or persons, firm, association or corporation shall within this state manufacture, compound, brew, distill, produce, process, pack, transport, possess, sell, offer or expose for sale, . . . any article of food which is adulterated or misbranded within the meaning of this article."  Section 200 of this law defines adulterated food and provides that food shall be deemed adulterated:

> 1. If it bears or contains any poisonous or deleterious substance which may render it injurious to health; but in case the substance is not an added substance such food shall not be considered adulterated under this subdivision if the quantity of such substance in such food does not ordinarily render it injurious to health.
>
> 2. If it bears or contains any added poisonous or added deleterious substance other than one which is (a) a pesticide chemical in or on a raw agricultural commodity, (b) a food additive, or (c) a color additive, which is unsafe within the meaning of section two hundred two, or if it is a raw agricultural commodity and it bears or contains a pesticide chemical which is unsafe within the meaning of section four hundred eight-a of the federal food, drug and cosmetic act, as amended, or if is, or it bears or contains, any food additive which is unsafe within the meaning of section four hundred nine of such federal act, as amended; provided, that where a pesticide chemical has been in or on a raw agricultural commodity in conformity with an exemption granted or a tolerance prescribed under section four hundred eight of such federal act, and such raw agricultural commodity has been subjected to processing such as canning, cooking, freezing, dehydrating or milling, the residue of such pesticide chemical remaining in or on such processed food shall not be deemed unsafe if such residue in or on the raw agricultural commodity has been removed to the extent possible in good manufacturing practice, and the concentration of such residue in the processed food, when ready to eat, is not greater than the tolerance prescribed for the raw agricultural commodity.

3. If it consists in whole or in part of a diseased, contaminated, filthy, putrid or decomposed substance, or if it is otherwise unfit for food.

. . . .

5. If it is the product of a diseased animal or of an animal which has died otherwise than by slaughter, or that has been fed upon the uncooked offal from a slaughterhouse.

. . . .

9. If damage or inferiority has been concealed in any manner.

. . . .

11. If it falls below the standard of purity, quality or strength which it purports or is represented to possess.

N.Y. Agric. & Mkts. Law § 200.

Plaintiff asserts in Count V that "by manufacturing, selling, processing, marketing and packaging canned tuna fish adulterated with poisonously high levels of mercury, the defendants violated [A & M] Law Sections 199-a(1), 200(1), 200(2), 200(3), 200(5), 200(9) and 200(11)." (Am. Compl. ¶ 52.) In *Langiulli*, 604 N.Y.S.2d at 1022, the court held that the apparent thrust and intent of Sections 199 and 200 of the A & M Law "is to prohibit the sale of impure or contaminated products, and [they] are not in fact aimed at the presence of foreign objects in the product." Thus, the court determined, a foreign substance such as a tuna bone in a can of tuna fish does not "adulterate" the tuna fish for purposes of this statute. *Id.* Based on this logic, Defendants assert that because mercury is natural to canned tuna, and because unlike with "a lingering fish bone, which with extraordinary care might have been removed, there is simply no way to remove mercury from tuna," there is an even more compelling argument that Defendants' canned tuna should not be deemed "adulterated" by virtue of the mercury found therein. (Defs.' Mem. 24–25.) Aside from the fact that the impossibility of removing mercury from tuna is not

part of the record before me, I do not find Defendants' argument persuasive.  If mercury

naturally occurs in canned tuna and cannot be removed, it is less "foreign" than a bone in a

purportedly boneless product would be.  In fact, it appears to this Court that mercury could be

the sort of substance from which the legislators wanted to protect consumers, because the statute

specifically contemplates that substances which are "not [] added substance[s]"—which would

include naturally occurring substances—could in some circumstances be an adulterant:  Section

200(1) of the A & M Law provides that foods that contain poisonous or deleterious substances

that are not added substances will not be considered adulterated "if the quantity of such

substance in such food does not ordinarily render it injurious to health."  N.Y. Agric. & Mkts.

Law § 200(1).  The flip side obviously is that a non-added (naturally occurring) substance can be

an adulterant if it ordinarily renders the food injurious to health.  Here, Plaintiff has alleged that

Defendants' tuna fish, in the quantity Plaintiff consumed (which I have determined was not

unreasonable as a matter of law), does, in fact, ordinarily render it injurious to health due to the

high concentration of mercury therein (although a jury might also find that Plaintiff's

consumption was not "ordinary").  Thus, taking Defendants' contention that mercury is natural

to tuna fish (and thus not an added substance) as true, Plaintiff has at this stage adequately

pleaded a violation of Section 200(1) of the New York State Agriculture and Markets Law.  It

may be that as the facts are developed, the Court on summary judgment or a jury could conclude

that the mercury in tuna does not "ordinarily" render it harmful, but such a conclusion cannot be

drawn from the Amended Complaint.  Plaintiff has similarly sufficiently pleaded a violation of

Section 200(11) because Defendants' tuna fish arguably fell below the standard of quality—

namely, that it was a heart-healthy product—that Defendants represented it possessed.

Defendants' motion to dismiss these claims is therefore denied.

Plaintiff's claims under Sections 200(2), 200(3), 200(5), and 200(9), cannot, however, survive. First, with respect to Section 200(2), despite Plaintiff's assertion to the contrary, there is no indication that Defendants' canned tuna contained "any added poisonous or added deleterious substance." The Amended Complaint does not allege any addition and is consistent with Defendants' claim that the mercury was already part of the fish before it was canned or sold. *See People ex rel. Brown*, 171 Cal. App. 4th at 1573 (affirming trial court's determination that preponderance of the evidence supports finding that methylmercury in tuna is naturally occurring). Next, with respect to Section 200(3), while Defendants' canned tuna contained mercury, it was not "contaminated" by such mercury because contamination under this section ordinarily refers to an external substance that adulterates the food product, *see, e.g.*, *J & R Salvage & Storage Co. v. Barber*, 410 N.Y.S.2d 413, 414 (3d Dep't 1978) (finding bags of coffee beans that were "heavily covered with mouse and rat excreta pellets" were "contaminated" under Section 200(3) of the A & M Law), and Plaintiff has not alleged that the mercury was external or added. Additionally, Defendants' tuna fish was not inherently "unfit for food;" it was perhaps merely unfit for consumption when eaten in certain quantities. Thus Plaintiff's claim under Section 200(3) cannot survive. Plaintiff's claim under Section 200(5) also cannot survive a motion to dismiss because Plaintiff has not alleged that Defendants' canned tuna is the product of a "diseased" animal, nor is there any reason to assume that the tuna was "diseased" by virtue of its high concentration of mercury. Finally, Plaintiff's claim under section 200(9) does not survive because the Complaint contains no facts suggesting that Defendants' canned tuna fish was inferior to ordinary canned tuna fish—indeed, it is apparently no different than any other canned tuna fish on the market—and Plaintiff does not allege that Defendants took any affirmative action to conceal the existence of the mercury. Thus, Defendants' motion

to dismiss Plaintiff's claims under Sections 200(2), 200(3), 200(5) and 200(9) of the New York State Agriculture and Markets Law (Count V) is granted.

Although Defendants assert in their motion papers that both Counts V and VI of Plaintiff's Complaint, alleging violations of New York State Agriculture and Markets Law, must be dismissed because they fail to state a claim, Defendants' arguments in their motion papers are limited to Plaintiff's claims in Count V under Section 200, with respect to adulterated food, and they do not address the merits of Plaintiff's claims in Count VI under Section 201, with respect to misbranding.  Likewise, Defendants have not included any discussion of Count VII of Plaintiff's Amended Complaint, which alleges that "defendants engaged in deceptive acts and practices in violation of New York State General Business Law Section 349(a)."  (Am. Compl. ¶ 58.)  Thus Counts VI and VII—which in any event appear to the Court, at least at first blush, to state a claim—will stand.

## IV.    Leave To Amend

Leave to amend a complaint should be freely given when justice so requires.  Fed. R. Civ. P. 15(a)(2).  It is within the sound discretion of the district court to grant or deny leave to amend. *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007).  "Leave to amend, though liberally granted, may properly be denied for:  'undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.'"  *Ruotolo v. City of N.Y.*, 514 F.3d 184, 191 (2d Cir. 2008) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)).  Amendment is futile when the claim as amended cannot "withstand a motion to dismiss pursuant to Rule 12(b)(6)," and "[i]n deciding whether an amendment is futile, the court uses the same standard as those governing the adequacy of a filed

pleading." *MacEntee v. IBM*, No. 08-CV-7491, 2011 WL 812395, at *8 (S.D.N.Y. Mar. 3,

2011) (internal quotation marks omitted).  Where the problem with a claim "is substantive[,]

better pleading will not cure it," and "[r]epleading would thus be futile."  *Cuoco v. Moritsugu*,

222 F.3d 99, 112 (2d Cir. 2000).  Leave to amend may also be denied where the party fails to

identify with sufficient specificity the facts that would save his Complaint were he granted leave

to amend.  *See Arnold v. KPMG LLP*, 334 F. App'x 349, 352–53 (2d Cir. 2009), *cert. denied*,

130 S. Ct. 503 (2009).

A pre-motion conference was held on August 17, 2010, at which time Plaintiff was

granted leave to amend his Complaint and was advised by the Court that he "ought to put

everything in there that [he's] got because[ i]f [Defendants'] motion is well taken, [he]'ll already

have had [his] chance to amend."  (Hr'g Tr. 5, Aug. 17, 2010.)  Plaintiff filed his Amended

Complaint on August 31, 2010.  (Doc. 9.)  He has not requested leave to file a Second Amended

Complaint, demonstrated how further amendment would cure the deficiencies that remain in his

pleadings, as identified in Defendants' papers, or submitted to the Court a Proposed Second

Amended Complaint addressing such deficiencies.  Accordingly, I decline to grant leave to

amend *sua sponte*.  *See, e.g.*, *Walton v. Morgan Stanley & Co.*, 623 F.2d 796, 799 n.7 (2d Cir.

1980) ("[A]ppellants never sought leave to amend their complaint either in the district court or as

an alternative form of relief in this court after [appellee] raised the issue of the sufficiency of

appellants' complaint.  Accordingly, we see no reason to grant such leave sua sponte."); *In re

Eaton Vance Mut. Funds Fee Litig.*, 380 F. Supp. 2d 222, 242 (S.D.N.Y. 2005) (denying leave to

amend because "the plaintiffs have had two opportunities to cure the defects in their complaints,

including a procedure through which the plaintiffs were provided notice of defects in the

Consolidated Amended Complaint by the defendants and given a chance to amend their

Consolidated Amended Complaint," and "plaintiffs have not submitted a proposed amended complaint that would cure these pleading defects"), *aff'd sub nom. Bellikoff v. Eaton Vance Corp.*, 481 F.3d 110, 118 (2d Cir. 2007) (plaintiffs "were not entitled to an advisory opinion from the Court informing them of the deficiencies in the complaint and then an opportunity to cure those deficiencies") (internal quotation marks omitted); *see also Ruotolo*, 514 F.3d at 191 (affirming denial of leave to amend "given the previous opportunities to amend").

## V.    Conclusion

For the reasons stated above, Defendants' Motion for Judicial Notice is GRANTED, and Defendants' Motion to Dismiss is GRANTED as to Counts III and IV, as to the allegations for breach of implied warranty and negligent failure to warn against Stop & Shop within Count II, and as to the allegations within Count V as to subsections 200(2), 200(3), 200(5), and 200(9), and DENIED in all other respects. The Clerk of the Court is respectfully directed to terminate the pending motions, (Docs. 19, 22). The remaining parties are directed to appear for a status conference on **October 14, 2011, at 11:00 a.m.**

**SO ORDERED.**

Dated: September 30, 2011
       White Plains, New York

_____
CATHY SEIBEL, U.S.D.J.

29